**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| RCN CAPITAL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **NOTICE OF REMOVAL** |
| | ) | |
| THE LOS ANGELES RAMS, LLC FKA THE ST. | ) | |
| LOUIS RAMS, LLC; THE RAMS FOOTBALL | ) | |
| COMPANY, LLC FKA LOS ANGELES RAMS | ) | |
| FOOTBALL COMPANY, INC.; NATIONAL | ) | |
| FOOTBALL LEAGUE, INC.; NFL | ) | |
| ENTERPRISES LLC; THE ST. LOUIS RAMS | ) | |
| PARTNERSHIP; KSE FOOTBALL, LLC; ITB | ) | |
| FOOTBALL CO, L.L.C.; ROGER GOODELL. | ) | |
| | ) | |
| Defendants. | ) | |

Defendants hereby remove to this Court the state court action described below, initiated by the filing of the Complaint contained in the state court file attached hereto as **Exhibit A**. Removal is proper under 28 U.S.C. §§ 1332(a) and 1441(a), because complete diversity exists among those parties not fraudulently joined, and the amount in controversy exceeds $75,000.

## NATURE OF THE CASE

1.     Plaintiff filed this lawsuit on July 28, 2016, in the Superior Court for the Judicial District of Tolland at Rockville, Connecticut.  The first defendant to be served by mail in this matter was served on August 3, 2016.  This Notice of Removal is thus filed within 30 days of that service date, as required by 28 U.S.C. § 1446(b).  All defendants consent to removal of this action.

2.     Plaintiff RCN Capital, LLC ("Plaintiff" or "RCN Capital"), purports to be a nationwide, direct private lender that provides short-term commercial loans to small business owners throughout the country.  (*See* Exh. 1 to Declaration of Todd Davis ¶ 3, attached hereto as **Exhibit B**.)  Defendants include various entities currently or formerly associated with the former

St. Louis Rams National Football League franchise, now known as the Los Angeles Rams (collectively the "Rams").

3.      Plaintiff also has attempted to join as defendants the National Football League, Inc., NFL Enterprises LLC (collectively, the "NFL Entities"), and the current NFL Commissioner, Roger Goodell ("Goodell").

4.      This case arises from RCN Capital's alleged acquisition of personal seat licenses ("PSLs") to the Stadium at America's Center in St. Louis, the venue in which the former St. Louis Rams played home games from 1995 through 2015 (the "Stadium").

5.      According to RCN Capital, an unidentified borrower pledged PSLs as collateral for a loan from RCN Capital.  After the borrower defaulted on the loan, RCN Capital allegedly exercised its rights to acquire the PSLs from the borrower.  RCN Capital did not acquire the rights to the PSLs until on or after March 2015, just months before the Rams relocated from St. Louis to Los Angeles.  (*See* Declaration of Meagan Roberts ¶¶ 3-4, attached hereto as **Exhibit C**.)  RCN Capital did not pay the Rams a transfer fee when it acquired the PSLs, as required under the terms of the governing PSL Agreement. (Exh. C ¶ 4; Compl. Exh. B ¶ 3.) RCN Capital also never purchased from the Rams the season tickets allotted by the PSL Agreement.  Thus, no monies were ever transferred from RCN Capital to the Rams in connection with RCN Capital's alleged acquisition of the PSLs.  *Id.*

6.      PSLs to the Stadium in St. Louis were governed by one of two PSL Agreements. Before the Rams moved to St. Louis in 1995, a St. Louis civic organization known as FANS Inc. sold PSLs in order to help finance the construction of a new stadium in St. Louis.  (Compl. ¶ 9; Compl. Exh. A ¶ 8.)  These original PSLs were governed by an Agreement known as the "FANS

2

PSL Agreement." (Compl. Exh. A.) The NFL Entities were not parties to the FANS PSL Agreement.

7.      After the Rams moved to St. Louis in 1995, the Rams utilized a new Agreement to govern PSLs; it was known as the "Rams PSL Agreement." (Compl. Exh. B.) The NFL Entities were not parties to the Rams PSL Agreement either. If RCN Capital acquired PSLs in 2015 as it alleges, those PSLs were governed by the Rams PSL Agreement.

8.      Shortly after RCN Capital purportedly acquired the PSLs via its borrower's loan default, the Rams relocated from St. Louis to Los Angeles. (Compl. ¶¶ 3, 29.)

9.      Both PSL Agreements, which are the subject of ongoing, pre-existing litigation pending in the United States District Court for the Eastern District of Missouri,[1] contain venue clauses requiring litigation in St. Louis. (Compl. Exhs. A ¶ 12(C), B ¶ 11(C).) Nonetheless, RCN Capital brought this lawsuit on July 28, 2016, in the Superior Court for the Judicial District of Tolland at Rockville, Connecticut.

10.      RCN Capital asserts that it has been harmed as a result of the Rams' relocation back to Los Angeles because: (a) it is no longer able to purchase Rams season tickets; and (b) it is not able to transfer the PSLs it acquired from the loan default. (Compl. ¶¶ 20-39.)

11.      Based on these allegations, RCN Capital asserts a wide swath of claims against the Rams including breach of contract (Counts 1, 2 and 4), promissory estoppel (Count 3), tortious interference (Count 5), statutory theft (Count 7), fraudulent representation (Count 9),

---

[1] *McAllister v. The St. Louis Rams, LLC*, No. 4:16-cv-00172-SNLJ (E.D. Mo. filed Feb. 9, 2016) (consolidated action involving three lawsuits pertaining to the PSL Agreements).

various violations of the Connecticut Unfair Trade Practices Act (Counts 10-15), and violation of the Connecticut Antitrust Act (Counts 16).[2]  *Id.*

12.     Inconceivably, Plaintiff also attempts to assert sweeping claims against the NFL Entities and Goodell, in his individual capacity, all of which appear to arise from the Rams' purported violations of the Rams PSL Agreement, to which the NFL Entities and Goodell are not parties or participants in any way.  Plaintiff's Complaint purports to contain claims against the NFL Entities and Goodell for tortious interference (Count 6), statutory theft (Count 8), various violations of the Connecticut Unfair Trade Practices Act including allegations of a vertical monopoly (Counts 12, 13, 15), and violation of the Connecticut Antitrust Act.  (Count 16).

13.     Though the Complaint names the NFL Entities and Goodell as defendants in at least six separate counts, there are few factual allegations specifically directed at them.  There are only three factual allegations related to the NFL Entities:

> a. RCN Capital alleges that the NFL Entities "adopted an approval resolution" for the Rams to relocate its franchise to St. Louis in 1995. (Compl. ¶ 8.)
>
> b. In connection with the Rams' 1995 move to St. Louis, RCN Capital alleges that the NFL Entities received some compensation as a result of the revenue sharing among the member teams.  According to Plaintiff, the NFL Entities approved the sale of PSLs for the construction of a new stadium in connection with the Rams' 1995 move to St. Louis.  As part of

---

[2] The Rams believe that the claims asserted against it lack merit and are not actionable under the Rams PSL Agreement, which by its express terms expired when the Rams relocated from St. Louis to Los Angeles after the 2015 NFL season.  (Compl. Exh. B ¶ 11A.)  The Rams will raise these issues in a dispositive motion at the appropriate time.

the revenue sharing among the various NFL teams, $17 million from the sale of the FANS PSL Agreements were "to be paid to the League and distributed pro rata to the other 29 member clubs of the League."  (Compl. ¶ 15.)  Additionally, the Rams allegedly paid the NFL Entities a $29 million relocation fee.  (Compl. ¶ 9.)

    c.    The NFL Entities operate a NFL Ticket exchange charging 15% on the resale of the ticket sale price.  (Compl. ¶¶ 30, 38.)

14.    None of the factual allegations against the NFL Entities (or Goodell) involve (nor could they) the Rams PSL Agreement (the one that was in force in 2015 when RCN Capital purportedly acquired PSLs).  Rather, the factual allegations lodged against the NFL Entities involve activities that occurred more than 20 years ago.  (Compl. ¶¶ 8, 15, 16.)

15.    As to Goodell, RCN Capital merely states without any support that: "Goodell knew of the [PSL] contract between Plaintiff and the Defendant St. Louis LA Rams."  (Compl. Count 6 ¶ 40.)

## BASIS FOR REMOVAL

16.    Removal of this action is appropriate under 28 U.S.C. § 1332(a), because the amount in controversy exceeds $75,000, and complete diversity exists among those parties not fraudulently joined.

17.    Section 1332(a) of Title 28 vests a federal court with jurisdiction when "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States."  Both requirements of § 1332(a) are met here.

**I.    The Amount in Controversy Exceeds $75,000.**

18.    RCN Capital alleges that the PSLs it acquired through a loan default originally cost $238,350.00 plus the cost of transfers.  According to the Complaint, RCN Capital is entitled

5

to, among other damages, a refund of the total cost of the PSL to the original purchaser.  (Compl. ¶¶ 14, 20, 42, 46.)

19.     RCN Capital further alleges that it suffered costs associated with the Rams' alleged default under the PSL Agreement, including attorney fees and statutory interest.  (Compl. ¶ 39.)

20.     Moreover, RCN Capital alleges that Defendants intentionally deprived RCN Capital of season tickets, which it would have sold on the resale market.  RCN Capital seeks compensation for its lost profit.  (Compl. ¶¶ 38-39; Count 8 ¶ 43.)

21.     RCN Capital also seeks treble damages, punitive damages, attorney fees, and costs pursuant to Conn. Gen. Stat. §§ 35-34, 35-35, 42-110g; 52-564.  (Compl. at 30-31; Count 7 ¶ 44; Count 8 ¶ 45; Count 10 ¶ 44; Count 11 ¶ 44; Count 12 ¶ 44; Count 13 ¶ 44; Count 14 ¶ 45; Count 15 ¶ 57; Count 16 ¶¶ 91, 93.)

22.     Accordingly, the amount in controversy exceeds $75,000 on the face of the Complaint.

## II.    Plaintiff and Defendants Are Citizens of Different States and Complete Diversity Exists for Purposes of § 1332(a) with the Exception of those Fraudulently Joined.

### a.    The Rams Entities and the Plaintiff RCN Capital are Completely Diverse.

23.     Plaintiff RCN Capital LLC is a Connecticut limited liability company.   On information and belief, the sole member of RCN Capital is Donald J. Vaccaro who resides in Connecticut.

24.     For purposes of § 1332(a), the citizenship of the Defendants – each an unincorporated association – is determined by reference to the citizenship of their members. *See Americold Realty Trust v. Conagra Foods, Inc.*, 136 S. Ct. 1012, 1015 (2016); *Carden v. Arkoma Assoc.*, 494 U.S. 185, 192–95 (1990); *Carter v. HealthPort Techs.,* LLC, 822 F.3d 47,

60 (2d Cir. 2016).  When members are themselves unincorporated associations, their citizenship is also determined by the citizenship of their members and so on.  *See Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Mgm't, LLC*, 692 F.3d 42, 49 (2d Cir. 2012).

25.    The members of Defendant ITB Football Company, L.L.C., are E. Stanley Kroenke, who resides in and is a citizen of Wyoming, and KSF Football, Inc., a Delaware corporation with its principal place of business in Colorado.  Thus, ITB Football Company, L.L.C., is diverse from the Plaintiff.

26.    The sole member of Defendant KSE Football, LLC, is Mr. Kroenke, who resides in and is a citizen of Wyoming.

27.    The members of Defendant The Los Angeles Rams, LLC, formerly known as The St. Louis Rams, LLC are ITB Football Company, LLC. and KSE Football, LLC.  The Los Angeles Rams, LLC is thus a citizen of Colorado, Delaware, or Wyoming.  Accordingly, the Los Angeles Rams, LLC, is diverse from the Plaintiff.

28.    The members of Defendant Rams Football Company, LLC, are The Lucia Rodriguez 2003 Irrevocable Trust (the "Lucia Trust"), and the Dale Carroll Rosenbloom, Jr., 2003 Irrevocable Trust (the "Chip Trust"), and the Georgia Frontiere Revocable Trust dated 2/18/2003 (the "Georgia Trust").  Lucia Rosenbloom, a California resident, is the sole beneficiary of the Lucia Trust and a 50% beneficiary of the Georgia Trust.  Dale Carroll Rosenbloom, Jr., a California resident, is the sole beneficiary of the Chip Trust and a 50% beneficiary of the Georgia Trust.  Accordingly, the Rams Football Company, LLC, is diverse from the Plaintiff.

29.     Although Plaintiffs have elected to separately sue The St. Louis Rams Partnership, that entity no longer exists.  It was converted into The St. Louis Rams, LLC, in or around September 2010, and therefore has its citizenship for purposes of § 1332(a).

### b.  The Citizenship of the NFL Entities is Irrelevant to the Court's Diversity Analysis Because They Were Fraudulently Joined.

30.     The citizenship of NFL Enterprises LLC and National Football League, Inc., whose members include Connecticut residents, should be disregarded for purposes of determining whether diversity jurisdiction exists because they were fraudulently joined.  RCN Capital attempts to assert claims for tortious interference (Count 6), statutory theft (Count 8), various violations of the Connecticut Unfair Trade Practices Act (Counts 12, 13, 15), and violations of the Connecticut Antitrust Act (Count 16) against them.  However, there is no possibility that RCN Capital can state a cause of action against the non-diverse NFL Entities based on the pleading filed or the facts alleged.

31.     As set forth in detail below, it is hard, if not impossible, to discern the gravamen of the claims against the NFL Entities (or Goodell, who is a citizen of New York, for that matter).  Many of Plaintiff's claims are incomprehensible; the paltry factual allegations do not seem to fit within the framework of the legal theories espoused.  Moreover, the bare-bones allegations are stated against the NFL Entities collectively with no differentiation among the actors.

32.     However, it is clear that neither the NFL Entities nor Goodell have any connection to the purportedly unlawful conduct (the Rams' breaching of the PSL Agreement or anything else to do with that Agreement) or the alleged harm that RCN Capital purportedly suffered (the "cost of the PSLs" and the potential resale value of Rams season tickets).  (Compl. ¶¶ 20, 38, 43, Count 8 ¶ 43.)  Thus, the only potential claims that could possibly arise from this

alleged injurious conduct sound against the Rams, not the NFL Entities which were in no way connected to the Rams PSL Agreement (the contract in force at the time RCN Capital purportedly acquired the PSLs).

33.     When, as here, a defendant has no real connection to a controversy, its citizenship should be disregarded when analyzing whether diversity jurisdiction exists.  *See, e.g.*, *Pampillonia v. RJR Nabisco, Inc.*, 138 F.3d 459, 460-61 (2d Cir. 1998) (holding company that was not implicated in the plaintiff's alleged retaliatory discharge was fraudulently joined and its citizenship did not destroy federal diversity jurisdiction).  Thus, because the NFL Entities have no real connection to this controversy, they have been fraudulently joined and their citizenship should be disregarded.

34.     Moreover, to the extent that RCN Capital attempts to assert liability against the NFL Entities based on their approval of the Rams' 1995 PSL plan or receipt of payments by the NFL Entities at that time, such claims are time barred.  *See* Conn. Gen. Statutes § 52–577 ("No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."); Conn. Gen. Stat. § 42-110g(f) (three years under CUTPA); Conn. Gen. Stat. § 35-40 (four years for antitrust claims); *Certain Underwriters at Lloyd's, London v. Cooperman*, 289 Conn. 383, 408, 957 A.2d 836, 850 (2008) (noting that statute of limitations for tort actions precludes tolling until injury or discovery).  "Although a statute of limitations defense does not attack the merits of [a] claim, such defense may be raised to challenge a fraudulent joinder."  *LaFountain v. Smith & Nephew, Inc.*, No. 14cv1598 (WWE), 2015 WL 3444343, at *1 (D. Conn. May 28, 2015).

### i.  Count 6: Tortious Interference.

35.     Plaintiff attempts to allege that the NFL Entities somehow tortiously interfered with the PSLs by approving the Rams' relocation despite their knowledge of the PSLs.  (Count 6

9

¶¶ 40-41.)  Under Connecticut law, the elements of a tortious inference claim are: "(1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss." *Am. Diamond Exch., Inc. v. Alpert*, 302 Conn. 494, 510, 28 A.3d 976 (2011) (citation omitted).  "A claim is made out only when the interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself . . . ." *IN Energy Solutions, Inc. v. Realgy, LLC*, 114 Conn.App. 262, 272, 969 A.2d 807 (2009); *see also Solomon v. Aberman*, 196 Conn. 359, 364, 493 A.2d 193 (1985).  In other words, a plaintiff must prove that "the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously." *Id.*  In order to plead tortious interference with contractual relations under Connecticut law, a plaintiff must demonstrate "intentional interference without justification."  *Greenwich Taxi, Inc. v. Uber Techs.*, Inc., 123 F. Supp. 3d 327, 342 (D. Conn. 2015) (quoting *Daley v. Aetna Life & Cas. Co.*, 249 Conn. 766, 805–06, 734 A.2d 112 (1999)).

36.    The Complaint does not contain a single factual allegation to suggest the NFL Entities (or Goodell) committed any sort of *tortious* conduct that interfered with the Rams' PSL Agreement.  That the NFL Entities allegedly followed established internal procedures to evaluate and eventually approve the Rams' request to relocate from St. Louis to Los Angeles − the only relevant factual allegation − certainly does not constitute fraud or misrepresentation or some other level of tortious conduct.  *See Greenwich Taxi, Inc.*, 123 F. Supp. 3d at 342-43 (dismissing tortious interference claim under Connecticut law where plaintiff failed to assert that defendant interfered with business relationship through fraud, misrepresentation, intimidation or molestation, or acted maliciously); *Robert S. Weiss & Associates, Inc. v. Wiederlight*, 208 Conn.

525, 536, 546 A.2d 216, 223 (1988) (the assertion that defendant "encouraged" employee to allegedly violate noncompetition covenant despite defendant's knowledge of the covenant's terms did not imply that defendant acted with requisite "fraud, misrepresentation, intimidation or molestation" or that it acted with malice).  Without some additional plausible allegations that the NFL Entities made misrepresentations or committed fraud in the course of approving the Rams' relocation to Los Angeles (none of which appear on the face of this Complaint), there simply is no possibility that RCN Capital can maintain a tortious interference claim against the NFL Entities.

37.     Additionally, the mere conclusory allegation that approving relocation was "willful" or "malicious," (Compl. Count 6 ¶ 41), is insufficient to save this flawed claim. *See Varley v. First Student, Inc.*, 158 Conn. App. 482, 508, 119 A.3d 643, 658 (2015); *Metcoff v. Lebovics,* 123 Conn.App. 512, 523, 2 A.3d 942 (2010).

### ii.   Count 8: Statutory Theft

38.     RCN Capital next claims that the NFL Entities conspired with the Rams to commit statutory theft of the value of RCN Capital's season tickets by operating for a fee the NFL Exchange.  (Compl. Count 8, ¶ 43.)  But the Complaint does not explain how operating the NFL Exchange − an online platform for fans to resell NFL Tickets − constitutes a theft from RCN Capital.  Nor is there a single factual allegation to support the bald assertion that there exists a "conspiracy" between the NFL Entities and the Rams that relates to the NFL ticket exchange.  The Complaint fails to allege anything at all related to the substance of the supposed conspiracy, including when it took place, who was involved, or where it occurred.

39.     Under Conn. Gen. Stat. § 52-564, it is unlawful to steal, receive, or conceal, the property of another "with intent to deprive another of property or to appropriate the same to himself or a third person."  *Kovaco v. Rockbestos-Surprenant Cable Corp.*, 979 F. Supp. 2d 252,

263 (D. Conn. 2013) (internal citations omitted); *see also Kosiorek v. Smigelski*, 138 Conn.App. 695, 713, 54 A.3d 564, 576–77 (2012).  To establish a claim for statutory theft, a plaintiff must plead and prove: (a) the property belonged to it; (b) the defendant intentionally deprived it of its products; and (c) that the defendant's conduct was unauthorized.  *See Discover Leasing, Inc. v. Murphy*, 33 Conn.App. 303, 309, 635 A.2d 843 (1993).  Unlike a simple conversion claim, statutory theft requires intent.  *See Suarez–Negrete v. Trotta*, 47 Conn.App. 517, 520–22, 705 A.2d 215 (1998).

40.     The Complaint lacks any factual allegations to suggest that the NFL Entities deprived RCN Capital of property, much less did so intentionally.  It is the Rams, not the NFL Entities, that sell season tickets.  (*See generally* Compl. Exhs. A, B.)  The NFL Entities do not direct the Rams season ticketing processes, do not allocate tickets to purchasers, and do not direct to whom the Rams do or do not sell tickets.  *Id.*  Any claim for statutory theft would sound against the Rams, not the NFL Entities.

41.     That the NFL Entities operate the NFL ticket exchange is completely irrelevant to a statutory theft claim.  Regardless, RCN Capital never purchased its allotted Rams season tickets after it acquired the PSLs in 2015, and thus has not and cannot allege that it sold or attempted to sell its Rams season tickets on the NFL ticket exchange.  Without such an allegation, RCN Capital cannot as a matter of law state a claim for statutory theft against the NFL Entities.  *See generally Weiss v. Weiss*, 297 Conn. 446, 470 n. 18, 998 A.2d 766 (2010) ("Statutory theft pursuant to § 52-564 . . . is synonymous with larceny under General Statutes § 53a-119"); *Conn. v. Smith*, 148 Conn. App. 684, 715, 86 A.3d 498, 517 (2014), aff'd, 317 Conn. 338, 118 A.3d 49 (2015) (proof that defendant took, obtained, or withheld "property from an owner" is an "essential element" of larceny claim under Connecticut law).

42.     Nor is there a single fact to suggest that the NFL Entities operated the ticket exchange with the intent to deprive RCN Capital of its property.  To the contrary, the ticket exchange long predated the Rams' relocation from St. Louis to Los Angeles, the date of the alleged injury to RCN Capital.  Thus, there simply are no facts to support a claim of an intentional act of theft committed by the NFL Entities here.

43.     Additionally, RCN Capital has not made any factual allegation to suggest that the NFL Entities committed any "unauthorized act."  There is no question that operating a ticket exchange is a completely lawful enterprise..

44.     Thus, RCN Capital has no possibility of stating a statutory theft claim against the NFL Entities.  *See Whitaker v. Taylor*, 99 Conn. App. 719, 732, 916 A.2d 834, 843 (2007) (affirming refusal of trial court to award damages for defaulted statutory theft claim where complaint was devoid of factual assertions that plaintiff suffered injury as a result of defendant's actions).

### iii.  Count 12: Violation of Connecticut Unfair Trade Practices Act

45.     RCN Capital also appears to assert that the NFL Entities violated the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b(a), by: (a) "misappropriating funds" from the sale of PSL Agreements to construct and maintain the Stadium in St. Louis and; (b) approving the Rams' relocation from St. Louis to Los Angeles before 2025, the latest possible expiration date of the PSL Agreement.  (Compl. Count 12, ¶ 40, incorporating Count 1.)

46.     RCN Capital cannot as a matter of law recover against the NFL Entities (or Goodell) under CUTPA.  It is undisputed from the face of the Complaint that all of the purported misappropriation by the NFL Entities (and Goodell) pre-dated RCN Capital's acquisition of PSLs.

13

47.     RCN Capital alleges that it did not acquire PSLs to the Stadium until 2015.  As alleged in the Complaint, its PSL acquisition postdated any payments made to the NFL Entities from the sale of PSLs.  (Compl. ¶ 15, Compl. Exh. D at 1995-1.)  And, regardless, RCN Capital did not pay any monies to the Rams for its PSLs, did not pay a transfer fee after acquiring its PSLs, and did not purchase Rams season tickets allotted under the PSLs.  (Exh. C ¶¶ 4-5.)  RCN Capital thus has not, and cannot, allege that it ever paid any money that was received by the NFL Entities.  *Id.*  RCN Capital itself has suffered no harm as a result of the fact that the NFL Entities allegedly received some portion of the proceeds from the sale of PSLs and thus does not have standing to sue the NFL Entities for this alleged CUTPA violation.  *See Aviles v. Wayside Auto Body, Inc.*, 49 F. Supp. 3d 216, 232 (D. Conn. 2014) ("standing under CUTPA requires that the plaintiff have 'some sort of business relationship' with the defendant business 'such that he suffers injury as either a consumer or competitor of the defendant or as some other businessperson affected by its unfair or deceptive acts.'"); *Goldsich v. City of Hartford*, 571 F. Supp. 2d 340, 346 (D. Conn. 2008) (granting summary judgment on plaintiff's CUTPA claim against defendant concert promoter because plaintiff had not purchased a ticket to the concert and thus was not a customer, competitor, or other business person).

48.     Moreover, "[t]o demonstrate a violation of CUTPA, a plaintiff must show that a defendant's conduct offends public policy, is immoral, unethical, oppressive, or unscrupulous, or causes substantial injury to consumers."  *TD Properties, LLC v. VP Bldgs., Inc*., 602 F. Supp. 2d 351, 365 (D. Conn. 2009); *see also Boulevard Associates v. Sovereign Hotels, Inc*., 72 F.3d 1029, 1038 (2d Cir. 1995).  Here, at absolute most, RCN Capital alleges that the NFL Entities facilitated a breach of the PSL contract by authorizing the Rams' relocation to Los Angeles.  A simple breach of contract, however, does not offend traditional notions of fairness, and such

actions cannot violate CUTPA.  *See Boulevard Associates*, 72 F.3d at 1038 (parent company's encouragement of subsidiary's alleged breach of lease agreement did not state a claim under CUTPA against either).  Because the Complaint lacks any factual allegations attributable to the NFL Entities of "material misrepresentations or omissions likely to mislead a consumer," the mere lawful and authorized act of approving relocation in accordance with NFL procedures cannot support a CUTPA claim.  *Id.*; *see also, TD Properties*, 602 F. Supp. 2d at 365.

### iv.  Count 13: Violation of Connecticut Unfair Trade Practice Act

49.     RCN Capital seems to claim that the conduct underlying its statutory theft claim (Count 8) − the NFL Entities' operation of the NFL Exchange − also constitutes a violation of the Connecticut Unfair Trade Practice Act.  (Compl. Count 13, ¶ 40.)  This claim fails as a matter of law for the same reasons RCN Capital's statutory theft claims against the NFL Entities (and Goodell) fail.  *See* Section II.B.ii. infra.  Additionally, it fails because there is no basis upon which to find that the ticket exchange itself was unlawful or that the NFL Entities operated the exchange in some manner that "offends public policy, was immoral, unethical, oppressive, or unscrupulous, or causes substantial injury to consumers'" as required by CUTPA.  *TD Properties*, 602 F. Supp. 2d at 365 (D. Conn. 2009).

### v.  Count 14: Connecticut Unfair Trade Practice Act

50.     Plaintiff RCN Capital further claims that the NFL Entities *per se* violated the Connecticut Unfair Trade Practice Act due to alleged "false advertisement" in purported violation of Regulation § 42-110b-24.  *See* Conn. Gen. Stat. § 42-110b(c).  (Compl. Count 14, ¶¶ 40-41.)

51.     Under Connecticut law, it is "an unfair or deceptive act or practice for any person in trade or commerce to sell merchandise for which service is not readily available without disclosing such fact to the purchaser prior to the sale of the merchandise."  Conn. Agencies Regs.

42-110b-24.  Here, however, the Complaint is devoid of any allegations that the NFL Entities

sold anything to RCN Capital, let alone that they deceived RCN Capital into purchasing PSLs or

tickets to the Stadium in St. Louis.  Rather, all of the purportedly offensive advertisements cited

in the Complaint are attributed to the Rams Entities.  (Compl. ¶¶ 17-18.)  Again, this claim

sounds, if at all, against the Rams and not the NFL Entities.  Further, the PSLs attached and

incorporated into the Complaint expressly disclose the possibility that the Rams would not play

in St. Louis for the entirety of the PSL period.  (Compl. Exh. A ¶ 12.A.)

52.     Moreover, RCN Capital does not allege that it viewed any of the allegedly false

advertisements or that it relied on these advertisements in entering into the PSLs.  Nor could it.

RCN Capital did not obtain the PSLs until 2015, long after it was public knowledge that the

Rams may relocate.  And, regardless, RCN Capital did not rely on advertisements in making a

purchase; it purportedly obtained the PSLs in a foreclosure of collateral on a loan it issued that

was in default.[3]  (*See* Exh. B ¶ 3 at Exh. 1.)

### vi.  Count 15: Connecticut Unfair Trade Practice Act

53.     Though confounding, RCN Capital next claims that the NFL Entities (and

Goodell) in conjunction with the Rams somehow violated the Connecticut Unfair Trade Practices

Act by "accepting payments for purchase of season tickets in the primary market, selling the

purchased season tickets seats to multiple parties, overselling the seating in the primary market,

then holding on to the purchasers [sic] money, as an interest free loan, using the money for a

period of time and not delivering tickets to all parties who paid for ticket [sic] in the primary

market."  (Compl. Count 15 ¶ 48.)  RCN Capital further alleges that the NFL Entities "refuse to

deliver tickets to ticket buyer [sic] such as the Plaintiff . . . who the [Defendants] believe[] will

---

[3] The PSL Agreement is not an investment vehicle.  (Compl. Exh. B ¶ 8.)

not resell tickets through the NFL exchange . . . ." (*Id.* ¶ 52.)  According to the Complaint, this behavior constitutes a "vertical monopoly" and "anti-completive [sic] conduct." (*Id.*)  Though it is difficult to discern any logical allegation stating a claim from this count, it appears that RCN Capital is suggesting that the Rams and the NFL Entities (and Goodell) failed to sell them tickets on the primary market thereby forcing RCN Capital to pay more for tickets on the secondary market.  (Compl. Count 15.)

54.     This outlandish claim against the NFL Entities fails as a matter of law for a myriad of reasons.  To begin with, the NFL Entities are *not* implicated in the alleged scheme.  As even the Complaint recognizes, it is the Rams − not the NFL Entities (or Goodell) − that sell season tickets on the "primary market."  (Compl. Exhs. A, B.)  Moreover, the NFL Entities do not sell tickets on the secondary market; they facilitate the sale between fans by offering the NFL Exchange platform.  Fans are not required to resell tickets on the platform and, in fact, multiple alternative online resale platforms exists.  Facilitating an open market between buyers and sellers without mandating use of that platform is the antithesis of a vertical monopoly whereby a seller restricts a buyer from purchasing the product (here the ticket) from another source.  If there was a shred of veracity to this baseless allegation, the claim would sound against the Rams, not the NFL Entities (or Goodell).

55.     Additionally, the Complaint is devoid of any factual support for the claim.  RCN Capital has not alleged and cannot allege that its PSLs were oversold or sold to multiple parties.[4] RCN Capital also has not alleged that it ever purchased tickets on the NFL exchange.

---

[4] This count is particularly puzzling as the St. Louis Rams had record low attendance in 2015. *Total regular season home attendance of the NFL St. Louis Rams franchise from 2006 to 2015*, Statista   (2016),   http://www.statista.com/statistics/197408/nfl-regular-season-home-attendance-of-the-st-louis-rams-since-2006/; Zac Jackson, *Smallest home opener crowd in 20 years watches Rams win,* NBC Sports (Sept. 14, 2015, 9:42 AM), http://profootballtalk.nbcsports.com/2015/09/

56.     Additionally, like Count twelve, this Count fails because it attempts to repackage RCN Capital's breach-of-contract claim as one under CUTPA.  Any asserted promise to sell Plaintiff season tickets arises from the PSL Agreements.  (*Id.* ¶¶ 40-47.)   To the extent that Plaintiff alleges that the NFL Entities oversells season tickets, (*Id.* ¶¶ 48, 51-52), this is refuted by the face of the Complaint.  (Compl. ¶¶ 21, 24) (alleging "Rams have refused to sell Plaintiff season tickets").

### v. Count 16: Violation of Connecticut Unfair Trade Practice Act and Connecticut Antitrust Act

57.     Finally, RCN Capital claims that the Rams and the NFL Entities violated the Connecticut Unfair Trade Practices Act and Connecticut Antitrust Act by entering into an agreement to "fix price[s]."  (Compl. Count 16, ¶ 84.)  Conn. Gen. Stat. §§ 35-26- and 35-28(a).

58.     Connecticut law provides that: "every contract, combination, or conspiracy is unlawful when the same are for the purpose, or have the effect, of: (a) Fixing, controlling, or maintaining prices, rates, quotations, or fees in any part of trade or commerce; (b) fixing, controlling, maintaining, limiting, or discontinuing the production, manufacture, mining, sale, or supply of any part of trade or commerce; (c) allocating or dividing customers or markets, either functional or geographical, in any part of trade or commerce; or (d) refusing to deal, or coercing, persuading, or inducing third parties to refuse to deal with another person."  Conn. Gen. Stat. Ann. § 35-28.

---

14/smallest-home-opener-crowd-in-20-years-watches-rams-win/; Brian Feldt, Rams' attendance drops 8% in potentially final season in St. Louis, St. Louis Bus. J. (Jan. 6, 2016, 10:08 AM), http://www.bizjournals.com/stlouis/news/2016/01/06/rams-attendance-drops-8-percent-in-potentially.html.  This Court may take judicial notice of generally known statistical facts. *See* FED. R. EVID. 201(b)*; Onondaga Nation v. New York*, 500 F. App'x 87, 89–90 (2d Cir. 2012) (taking judicial notice of population and development facts); *Stamford Hosp. v. Vega*, 236 Conn. 646, 655, 674 A.2d 821, 827 (1996) (taking judicial notice of the number of hospitals in Connecticut).

59.     Like Count 15, it is impossible to discern the purported foundation for this unsupported price fixing claim.  RCN Capital has not alleged a single plausible factual allegation to support a conspiracy between the Rams and the NFL Entities to fix prices for Rams tickets either on the primary or secondary markets.  Nor has RCN Capital alleged how it could have been injured by such price fixing − after acquiring the PSLs through a loan default, it never actually purchased Rams seasons tickets.

## CONCLUSION

60.     RCN Capital's Complaint contains wholly baseless, nonsensical statements trying to state claims against the NFL Entities (and Goodell).  RCN Capital has contorted what is at most a breach of contract action against the Rams into a harassing 16-count action with implausible claims against the NFL Entities and its current Commissioner − entities that have no nexus to and received no monies from the Rams PSL Agreement that governed the licenses acquired by RCN Capital in 2015.

61.     Because there is "no possibility that the claims against [the NFL Entities] could be asserted in state court," the NFL Entities were fraudulently joined for diversity and removal purposes, and their presence is disregarded in determining jurisdiction.  *See Bounds v. Pine Belt Mental Health Care Res.*, 593 F.3d 209, 215 (2d Cir. 2010).

62.     The only arguably-viable causes of action are against the Los Angeles Rams, the Rams Football Company, LLC, KSE Football, LLC, ITB Football Co., LLC, and the Los Angeles Rams, LLC, all foreign defendants, and therefore this matter involves parties of completely diverse citizenship.

63.     The requirements of § 1332(a) are thus satisfied, and removal is appropriate under 28 U.S.C. § 1441(a).

64.     For all the foregoing reasons, Defendants respectfully request that the Court exercise jurisdiction over this action, as mandated by 28 U.S.C. §§ 1332(a), and 1441(a). Defendants intend no admission of liability by this Notice and expressly reserve all defenses, motions, and pleas, including without limitation objections to the sufficiency of Plaintiffs' pleadings and to the propriety of class certification.

Dated: August 31, 2016                              Respectfully Submitted,

                                                    DENTONS US LLP


                                          By:   _/s/ Diane Westwood Wilson_____
                                                Diane Westwood Wilson (ct25376)
                                                1221 Avenue of the Americas
                                                New York, NY 10020
                                                Phone:  212-905-8369
                                                Facsimile:  212-768-6800
                                                diane.wilson@dentons.com

                                                *Attorney for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of August, 2016, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon the following, and a copy of the foregoing was also served via U.S. mail to:

Jason L. McCoy
Law Offices of Jason L. McCoy, LLC
280 Talcottville Rd.
Vernon, CT 06066
*Attorney for Plaintiff*

*/s/ Diane Westwood Wilson*